IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOSEPH A. STALLARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:15-cv-416 (LMB/JFA) |
| | ) |
| BANK OF AMERICA, N.A., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the Court is defendant Bank of America's Motion for Summary Judgment [Dkt. No. 13]. For the reasons that follow, the motion will be granted.

### I.    BACKGROUND

This civil action concerns pro se plaintiff Joseph A. Stallard's allegations that defendant Bank of America ("Bank" or the "defendant") violated state and federal law by charging Stallard excessive interest rates. Complaint [Dkt. No. 1] ("Compl.") ¶ 3. In March of 2006, Stallard opened an unsecured revolving credit account ("the account") with the defendant's predecessor, MBNA America ("MBNA"). Defendant Bank of America's Answer and Affirmative Defenses [Dkt. No. 3] ("Answer") at 2. Stallard alleges that MBNA and the defendant had already merged at that point, meaning that he opened the account with the Bank rather than with its predecessor. Plaintiff's Opposition to Defendant's Motion for Summary Judgment [Dkt. No. 16] ("Opp'n") at 1. The account had an initial credit line of $5,000. Defendant Bank of America's Memorandum in Support of its Motion for Summary Judgment [Dkt. No. 14] ("MSJ Br.") at 3. Upon opening the account Stallard made a balance transfer to the account of $4,348. Id.

The Bank maintains that on or about March 31, 2006, a copy of the account agreement was mailed to Stallard's Alexandria, Virginia address where he still resides. Bank of America's Reply in Support of Motion for Summary Judgment [Dkt. No. 20] ("Reply") at 5. That agreement stated: "You agree to the terms of this Agreement when you, or anyone whom you authorize or permit, accept or use your Account." MSJ Br. at 3. According to defendant, this agreement was also available to Stallard through the online banking portal he used to make payments on the account. Supplemental Declaration of George E. Driver IV [Dkt. No. 20-1] ("Supp. Driver Decl.") ¶ 4. The agreement stated that it was "made in Delaware," that MBNA "extend[ed] credit to [Stallard] from Delaware," and that the agreement was "governed by the laws of the State of Delaware." Declaration of George Driver [Dkt. No. 14-1] ("Driver Decl.") ¶ 3. In June of 2006, MNBA changed its name to FIA Card Services N.A. ("FIA"). MSJ Br. at 2. Both FIA and MBNA were located in Delaware during the relevant time period. Id.; see also Driver Decl. ¶ 4. Despite this evidence, Stallard maintains that he opened his account with the defendant and not with MBNA or FIA. Opp'n at 2.

The parties do not dispute that when Stallard opened the account, it carried periodic rate finance charges, including a variable interest rate of 23.99% annual percentage rate ("APR"), and was subject to certain transaction fee finance charges, including a 3.00% finance charge on certain credit advances. MSJ Br. at 3; see also Compl. ¶ 9. Stallard received monthly statements from the Bank showing his current payment due, identifying the effective APR for that billing period, and indicating which portion of the balance was subject to the applicable interest rates. MSJ Br. at 3. These monthly statements were mailed to Stallard's home address in Alexandria. None of these statements were returned as undeliverable. Supp. Driver Decl. ¶ 3. Defendant alleges that Stallard also had access to the monthly statements through the online banking system

2

he used to make his monthly payments. Reply at 11. Stallard disputes whether the monthly statements were mailed to him but admits that with the exception of one payment on December 20, 2012 made by phone, he made all monthly payments online, Stallard Decl. ¶ 7, and he does not dispute that the effective APR shown on his monthly statements included both the periodic rate finance charges on the account balance and any transaction fee finance charges for that statement period. Opp'n at 4; see also Driver Decl. ¶ 9.

The defendant represents that in October of 2007, it mailed Stallard his monthly statement indicating that a minimum payment of $132 was currently due on the account and stating in all capital letters: "AN IMPORTANT AMENDMENT TO YOUR ACCOUNT TERMS IS ENCLOSED." MSJ Br. at 4. The enclosed amendment stated that the parties' agreement was amended such that it now had a fixed interest rate of 27.98%, and also stated that Stallard had the option to reject the changes to his account but that his continued use of the account after November 2007 would constitute acceptance of the new rate, even if he sent a timely rejection. Id. Stallard does not dispute that the interest rate rose to 27.98% at that time, that he paid the amount due at the end of October 2007, and that he continued to make monthly payments after that time without objection. Opp'n at 4-5; see also Supp. Driver Decl. ¶ 5. In January 2008, Stallard drew an access check for $1,000 as a cash advance from the account. That advance was subject to the 3.00% transaction fee charge, in addition to the regular periodic rate, meaning that the effective rate for the billing period that ended on February 6, 2008 was 33.9%. MSJ Br. at 5; see also Compl. ¶ 11.

It is undisputed that Stallard continued to make monthly payments from March 2006 until April 2013, although he missed some monthly payments and incurred late fees. MSJ Br. at 5. In

April of 2013, Stallard made a final payment that brought the account balance to zero. Answer at 2; see also Compl.¶ 7. The account has remained inactive since that last payment.

In October 2014, FIA merged into and with the defendant. MSJ Br. at 2. In January of 2015, Stallard requested that the Bank send him the terms and conditions for the account. Id. at 5. Stallard alleges that he asked defendant for "a copy of the original agreement" and received an agreement listing the interest rate as 18% and stating that the agreement was governed by the law of North Carolina. Compl. ¶ 11. The Bank explains that the account terms sent to Stallard bore a 2015 copyright from Bank of America and "reflected the then current interest rate of 18% that would be charged if [Stallard had] re-opened his account in January of 2015." MSJ Br. at 5. Driver Decl. ¶ 17. Stallard now admits that the copy of the agreement he received in January 2015 is not a copy of the original agreement. Declaration of Joseph A. Stallard [Dkt. No. 16-1] ("Stallard Decl.") ¶¶ 3-4.

Stallard initiated this action in March of 2015, alleging violations of the National Banking Act ("NBA") and state law. In Count I, Stallard alleges that the Bank charged usurious interest rates in violation of 12 U.S.C. § 85 and that under 12 U.S.C. § 86 he is entitled to twice the amount of the illegal interest paid. Compl.¶ 16. In Count II, Stallard alleges that the bank willfully interfered with and converted his money without lawful justification, thereby causing him damage. Id. ¶¶ 18-19. Stallard seeks to compel the Bank to provide sufficient documents to allow him to calculate the total interest paid, and he seeks actual damages as well as enhanced, exemplary, and special damages. Id. ¶¶ 21-24. The Bank denies Stallard's allegations, argues that Stallard fails to state a claim upon which relief can be granted, and raises the affirmative defenses that Stallard's claims are barred by the parties' contractual agreements, laches, the doctrines of estoppel and waiver, and his failure to mitigate damages. Answer at 4. The Bank

4

also asserts that it complied with the relevant provisions of the NBA, acted at all times in a reasonable manner, and that any damages suffered by Stallard were the result of his own acts or omissions. Id. at 4-5. The Bank has moved for summary judgment on both counts. Stallard has responded to the motion.

## II. DISCUSSION

The defendant argues that it is entitled to summary judgment on both counts of Stallard's complaint because it never charged plaintiff an interest rate higher than what was permitted under Delaware law which governed the agreement between plaintiff and defendant and consequently did not violate the NBA. MSJ Br. at 1. The defendant further argues that Stallard's conversion claim fails because it stems entirely from the NBA claim, defendant did not wrongfully exercise authority over Stallard's funds, and the allegedly converted funds are not readily identifiable. Id. at 2. Stallard contends that he did not consent to the interest rates charged by defendant, and therefore that both his NBA and conversion claims should survive summary judgment because the defendant wrongfully converted his property by charging excessive interest rates. Opp'n at 1.

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009).

Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id. The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than just "metaphysical doubt[s]," that establish that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotations omitted). The "uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment." Diquollo v. Prosperity Mortg. Corp., 984 F.Supp.2d 563, 570 (E.D. Va. 2013) (citing Auto. Fin. Corp. v. EEE Auto Sales, Inc., No. 1:10CV1407, 2011 WL 2580399, at *5 (E.D. Va. June 28, 2011)). Instead, when a party supports its summary judgment motion with proper affidavits, "the opposing party must set forth specific facts, in affidavits or otherwise, demonstrating that there is a genuine issue for

trial." Pelphrey v. United States, 674 F.2d 243, 246-47 (4th Cir. 1982) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). The failure to do so "renders all other facts immaterial" and entitles the movant to summary judgment as a matter of law. Rhodes, 636 F.3d at 94.

### B. The Driver Declaration

The defendant relies on two declarations from George Driver made under penalty of perjury to support its motion. Stallard argues that the Court cannot rely on the Driver declarations because "George Driver is an interested witness" due to his employment with defendant. Opp'n at 8-9. Stallard contends that a jury should be allowed to rule on Driver's credibility, implying that a jury would not believe Driver's testimony because of purported negative public sentiment towards the defendant. Stallard further asserts that Driver does not have personal knowledge of the information in his affidavit because he did not begin working for the defendant until 2007. Id. at 9. Stallard relies upon Sartor v. Arkansas Natural Gas Corporation for the proposition that an affidavit of an interested witness cannot be a basis for granting summary judgment, but Sartor involved expert witnesses also employed by the defendant who had previously testified on the same issues at a trial where the jury found against their testimony and the court of appeals had affirmed the jury's verdict. 321 U.S. 620, 626-28 (1944). The Fourth Circuit has confirmed that Sartor is a viable precedent, but also has found that it does not overcome the general rule that the nonmoving party "must submit affidavits or other material setting forth specific facts to show that there is a genuine issue for trial." Pelphrey, 674 F.2d at 247-48.

Stallard has not provided any specific evidence undermining Driver's credibility other than irrelevant claims of wrongful behavior by the defendant. Moreover, Driver did not provide

7

opinion testimony in his affidavit, and Stallard has not shown that Driver was not working for MBNA and FIA during the times Stallard had his account. Therefore, Driver's declarations are appropriate evidence on which to base a summary judgment decision.

### C. Count I: National Bank Act

In Count I, Stallard alleges that defendant violated the NBA and specifically 12 U.S.C. § 85 by charging a usurious interest rate. Compl. ¶¶ 14-16. Under Section 85, a bank may charge interest "at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more." 12 U.S.C. § 85. This provision allows a national bank to "charge interest 'on any loan' at the rate allowed by the laws of the State in which the bank is 'located.'" Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., 439 U.S. 299, 308 (1978). For the purposes of this section, a bank is "'located' in the State named in its organization certificate," and maintains that location even when "extending credit to residents of a foreign State." Id. at 310.

The defendant contends that when Stallard consented to the original agreement with its predecessors, MBNA and FIA, both of those entities were located in Delaware, making Delaware law the applicable law for purposes of determining any limit on the interest to be charged. Reply at 4. Although Stallard disputes whether his agreement was with the defendant or its predecessors, he appears to believe that either Delaware or Virginia law is applicable to the agreement. Compl. ¶ 15 (citing 5 Del. Code § 943 and Va. Code § 6.2-312A and concluding that according to those provisions "Bank of America may only legally charge the interest rate

8

provided in the agreement").[1] Moreover, although he disputes receiving the original agreement upon opening the account, the "actual original agreement" he attached to his Declaration, like the one provided by the defendant, states that the agreement is with MBNA, that it "is made in Delaware" and governed by Delaware law, and that credit is extended by MBNA to Stallard from Delaware. Stallard Decl. Ex. 2; Driver Decl. Ex. A. Given this clear evidence, Delaware law governs the rates of interest defendant could legally charge Stallard.

Under Delaware law, a bank may "charge and collect periodic interest under a revolving credit plan" at such "rate or rates as the agreement governing the plan provides or as established in the manner provided in the agreement governing the plan." 5 Del. Code § 943. Consequently, as Stallard concedes, the defendant was legally permitted to charge Stallard "the interest rate provided in the agreement." Compl. ¶ 15. It is uncontestable that the agreement for the account Stallard opened in March 2006 provided for periodic finance charges including a variable interest rate of 23.99% APR, which was increased by an amendment in 2007 to a fixed interest rate of 27.98%.[2] MSJ Br. at 3-4. Stallard agreed to these terms by making routine payments and otherwise using the account for seven years without any objection. Reply at 10.

---

[1] In Stallard's opposition, he argues that the complaint's reference to Delaware law is not a concession that Delaware law applies. Instead he argues that "even under Delaware law, the actions still violate the usury laws." Opp'n at 3. He also clarifies that the complaint's reference to the defendant's headquarters in North Carolina does not mean that the account terms should have been governed by North Carolina law. Id. at 12. Stallard does not clarify on what basis Virginia law might apply to the account agreement; however, even if Virginia law applied the result would be the same, as Virginia provides that a lender may impose "finance charges and other charges and fees at such rates and in such amounts and manner as may be agreed upon by the creditor and the obligor." Va. Code § 6.2-312A.

[2] Stallard argues that any promise made in the original agreement regarding the variable rate was "illusory," because the agreement stated that changes in the index could cause the rate to go up or down, but in reality defendant switched to a higher fixed rate as soon as the index went down. Opp'n at 19. The amendment does not demonstrate that the original agreement contained an illusory promise; rather, it demonstrates only that defendant lawfully amended the terms of the agreement and provided Stallard the opportunity to reject or accept those new terms.

Although Stallard agrees that the terms of a valid agreement establishing interest rates would be legal under Delaware law and the NBA, he disputes the existence of such an agreement and his assent to any such terms. Opp'n at 10. Stallard initially alleged that the original agreement was the one he received in January 2015 from the defendant and which provided an 18% interest rate. Compl. ¶ 16. He now acknowledges that the 2015 document was not the "actual original agreement" and he has attached a copy of what he claims is the "actual original agreement" ("Stallard copy") to his opposition.[3] Stallard Decl. ¶ 3. Stallard does not disclose how or when he obtained the Stallard copy, but seems to imply that this copy is a copy of the original agreement mailed to him in March 2006. Opp'n at 2.

The Stallard copy differs from the copy of the agreement provided by the defendant ("the Bank copy") by omitting pages of information that are present in the Bank copy. Those missing pages establish the applicable interest rates. In fact, the Stallard copy does not contain any information regarding interest rates, a striking omission for a credit account agreement. Moreover, the page numbers in the Stallard copy skip from the first page to page "3 of 5," and the pages that are included use terms and references not defined within the provided pages. Stallard Decl. Ex. 2. In contrast, the Bank copy provides pages between the first page and page "3 of 5" that establish interest rates and define relevant terms used in the later pages, and its language and organization is otherwise identical to Stallard's copy. Driver Decl. Ex. A. It is Stallard's copy, not defendant's, that raises questions of authenticity because the Stallard copy is clearly missing terms and information that would typically be included in such an agreement.

---

[3] Despite acknowledging that the 2015 document was not the original agreement with defendant, Stallard continues to rely upon the 2015 document in an attempt to confuse the issues further and characterize the defendant as "constantly chang[ing] the agreement" and its applicable law. Opp'n at 12. The 2015 document, however, reflected the terms that would have applied had Stallard re-opened his account. Reply at 16-17. It is therefore irrelevant to determining the terms of the original agreement and subsequent amendment.

10

Given these discrepancies, and its failure to provide evidence that rebuts defendant's claims, such as different interest rates, the Stallard copy is insufficient to create a triable issue.

Stallard maintains that even if the Bank copy provides the terms of the original agreement, he did not accept those terms. Opp'n at 13. Stallard primarily argues that he neither accepted nor used the account, that opening the account through the initial balance transfer does not constitute use, that he did not manifest clear assent in writing, that the existence of mutual assent is a jury question, and that the agreement was for an implied-in-fact contract, the existence of which is also a jury question. Id. at 13-17.[4]

The clear terms of the original agreement defeat Stallard's arguments. The first paragraph of the first page of both the Bank and Stallard copies state: "You agree to the terms of this Agreement when you, or anyone whom you authorize or permit, accept or use your Account." Stallard Decl. Ex. 2; Driver Decl. Ex. A. Therefore, the agreement was an express written contract that provided for assent either by acceptance or use, and the defendant's argument that Stallard assented by using the account is an accurate reflection of those terms, rather than a demonstration of lack of evidence.

Moreover, the Bank has produced specific evidence showing that Stallard used the account by making monthly payments to pay off the balance he transferred to the account and by drawing an access check in 2008.[5] Driver Decl. Exs. B, D, E; Supp. Driver Decl. Exs. A-C.

---

[4] Stallard raises a number of other arguments regarding the validity of the agreement, namely that there was fraud in the factum, no meeting of the minds, gross inequality of bargaining power, and unconscionability. Opp'n at 18-20. Not only did Stallard fail to allege these claims in his complaint, but he also fails in his opposition to properly allege the elements of those claims or to provide any evidence of fraud or unconscionability, making these arguments meritless.

[5] With regards to the initial balance transfer, Stallard argues that the transfer was made before the Bank mailed him the account agreement and consequently could not constitute use for the purposes of demonstrating assent. Opp'n at 3, 14. Even if this initial transfer cannot serve as evidence of use, the Bank's evidence that Stallard continued to use the account for seven years

11

Stallard admits to making monthly payments online, Opp'n at 4, and also admits that drawing the access check in 2008 constitutes "use," but he argues that the 2008 check could only have accepted the 2007 amended agreement.[6] Id. at 14-15 (stating that "Plaintiff never used the account until it had already been amended"). Contrary to Stallard's arguments, his payments and the drawn access check "unequivocally manifest[] acceptance" of both the original agreement and its amendment. Grasso v. First USA Bank, 713 A.2d 304, 309 (Del. Super. 1998) (plaintiff who both made payments on a transferred balance and used her credit card manifested assent to the terms "[b]y either act, but certainly by both"); see also Mitchell v. Sajed, No. 3:13-CV-312, 2013 WL 3805041, at *3 (E.D. Va. July 22, 2013) (plaintiff's receipt of his credit card, use of the card, and payments on the balance constituted acceptance of the agreement).

Despite defendant's overwhelming evidence to the contrary, Stallard continues to argue that defendant lacks proof of assent because his online payments do not show that he "received, read, understood or agreed to the terms" expressed in the agreement and in the paper statements provided by defendant. Opp'n at 17. Other than his argument, Stallard presents no evidence to rebut the defendant's contention that both the original agreement and the paper statements were mailed to Stallard at his address and that those mailings were never returned as undeliverable.[7] Merely stating that it is "unclear" how he received statements does not rebut defendant's evidence that he received them and consequently received ongoing notice of the terms of the

---

after the initial transfer by making monthly payments and drawing an access check clearly demonstrates use that reflects Stallard's assent to the terms of the agreement.
[6] This admission renders irrelevant Stallard's arguments that the amendment is invalid.
[7] Stallard argues that his use of access check number 1006 demonstrates that he did not receive paper statements because defendant's exhibit of a November 2007 mailing only contains access checks numbered 1003-1005. Opp'n at 23. This assertion fails to rebut defendant's evidence that paper statements were mailed to Stallard's home and not returned as undeliverable. Moreover, Stallard's argument that he had "no reason to read [paper statements] because the information is online" demonstrates only that he could have accessed the account terms online in addition to receiving the paper statements, not that he did not receive paper statements. Id.

agreement as he continued to use the account, thereby accepting its terms. Similarly, Stallard's conclusory statement that "[w]e will never really know what was in the October 2007 mailing" fails to demonstrate that he did not receive that month's statement with the enclosed amendment. Id. at 24. Therefore, Stallard has not carried his burden of producing "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 587 (internal quotations and emphasis omitted).

Although Stallard admits to having used the account after the 2007 amendment, he still argues that the amendment did not meet the "clear and conspicuous standard" because the exhibit provided by the defendant is larger than the actual amendment, which is just a "tiny bill stuffer that is easy to miss" and is "small and difficult to read." Opp'n at 24-25. Delaware requires that a bank which amends an agreement to increase the rates of periodic interest must provide "a clear and conspicuous written notice" to the borrower that "describe[s] the amendment" and "set[s] forth the effective date thereof." 5 Del. Code § 952(b)(1). The October 2007 monthly statement containing the amendment clearly stated on the first page in all capital letters "AN IMPORTANT AMENDMENT TO YOUR ACCOUNT TERMS IS ENCLOSED." Driver Decl. Ex. D. The enclosed amendment was two pages long, had the heading "IMPORTANT AMENDMENT TO YOUR ACCOUNT AGREEMENT," clearly stated that the APR would increase to 27.98%, and provided straightforward instructions for how Stallard could reject the amendment. Driver Decl. Ex. C. Stallard does not dispute that the information contained in the amendment was sufficient, only that it was too "small and difficult to read;" however, he does not provide any evidence or authority demonstrating that the amendment failed to comply with Delaware law.[8]

---

[8] In contesting the validity of the amendment, Stallard attempts to apply the Federal Trade Commission ("FTC") standards for advertising disclosures to those for disclosure of interest rate amendments. Opp'n at 25. The FTC standards are not applicable here and Stallard has not shown

13

Because plaintiff has failed to present any evidence, other than his view of the facts, that creates a genuine factual dispute and because no reasonable juror could find that the defendant violated § 85 of the NBA, Count I does not survive summary judgment.

### D. Count II: Conversion

In Count II, Stallard asserts a state law conversion claim premised on Count I's allegations that the defendant charged excessive interest. Conversion is "any wrongful exercise or assumption of authority...over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 905 (Va. 1994) (quoting Universal C.I.T. Credit Corp. v. Kaplan, 198 Va. 67, 75 (Va. 1956)) (internal quotations omitted).

The defendant correctly argues that Stallard's conversion claim fails for the same reasons Count I fails. In addition to not wrongfully exercising authority over Stallard's property, the defendant also argues that the funds allegedly converted are not specifically identifiable. Reply at 14. Stallard tries to support his conversion claim by arguing that his payments to the defendant were not voluntary because he would have faced legal action had he failed to pay, and therefore that he has demonstrated a "forceful assumption of authority by the Bank" over his money. Opp'n at 27. Stallard also states that "it doesn't matter how the Bank came into possession" of his money, only that the defendant has "money that belongs" to him. Id. Stallard's conclusory allegations fail to demonstrate any wrongful assumption or exercise of authority by the defendant

---

any applicable standards or controlling authority that would demonstrate that the Bank's amendment was not clear and conspicuous under Delaware law. Stallard also claims that the amendment violates the Truth in Lending Act ("TILA") as interpreted by the Ninth Circuit. Id. at 26 (citing Barrer v. Chase Bank USA, N.A., 566 F.3d 883, 892 (9th Cir. 2009). Stallard did not allege any TILA violation in his complaint and does not purport to do so now, making this argument irrelevant. Id.

14

over his money. As determined above, the defendant charged Stallard rates of interest specifically authorized by a valid and enforceable agreement and amendment, which Stallard accepted by paying off the account balances without protest. Stallard has not provided any evidence to show that he did not voluntarily agree to those terms. The possibility of legal action corresponds to any valid legal obligation and does not demonstrate a "forceful assumption of authority." Therefore, Stallard fails to produce any facts establishing a genuine dispute as to whether the defendant wrongfully exercised or assumed authority over his property.

Stallard also fails to demonstrate that the allegedly converted property, in this case money, is specifically identifiable. Under both Delaware and Virginia law, money can only be the subject of a conversion claim in limited circumstances, including when it is part of a segregated or identifiable fund. Jones v. Bank of Am. Corp., No. 4:09CV162, 2010 WL 6605789, at *5 (E.D. Va. Aug. 24, 2010) (discussing the general rule that money cannot be converted and the limited exceptions to that rule); In re Opus E., 528 B.R. 30, 108 (Bankr. D. Del. 2015). Stallard argues that the money is separate and identifiable because the account is named and the account statements itemize the amounts owed and paid, making it possible to calculate how much money was allegedly converted, Opp'n at 29; however, the amount he alleges he overpaid in interest was not in any way segregated from the other amounts he paid. Moreover, Stallard cannot demonstrate how much he overpaid in interest, because he does not identify what the applicable rate of interest should have been. Id. at 10. Therefore, because the allegedly converted funds are neither segregated or specifically identifiable, they could not be the subject of a conversion claim, and summary judgment will be granted to the defendant on this count.

III. CONCLUSION

For the reasons stated above, the defendant's Motion for Summary Judgment will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 22nd day of September, 2015.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
**United States District Judge**